1
2
3
4          **UNITED STATES DISTRICT COURT**
5             **DISTRICT OF NEVADA**
6                 \* \* \*

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:14-cv-01649-RFB-GWF |
| Plaintiff, | |
| v. | **OPINION & ORDER** |
| | Preliminary Injunction as to Defendants |
| | Health Formulas, LLC; Pure Vitamins, LLC; |
| HEALTH FORMULAS, LLC, *et al.*, | Longhorn Marketing, LLC; Method Direct, |
| | LLC; Weight Loss Dojo, LLC; VIP Savings, |
| Defendants. | LLC; DJD Distribution, LLC; MDCC, LLC; |
| | Jason Miller; and Danelle Miller |

## I.    INTRODUCTION

The above-captioned matter is before the Court on an Order to Show Cause why a preliminary injunction should not issue against Defendants. ECF No. 12. The Order to Show Cause accompanied this Court's issuance of a Temporary Restraining Order (TRO), including an asset freeze and appointment of a Temporary Receiver, against Defendants on October 9, 2014. Id. On November 17, 2014, the Court heard oral argument as to whether a preliminary injunction should issue and, for the reasons it stated at the hearing, extended the TRO through December 15, 2014. See ECF Nos. 63, 66, 72. The Court allowed supplemental briefs to be filed by the parties and heard further argument at a hearing on December 15, 2014, at which time the Court asked the parties if there were any objections to extending the TRO until a written decision on the preliminary injunction was issued. No objections were made.

For the reasons discussed below, the Court grants a preliminary injunction and extends the asset freeze and appointment of a Temporary Receiver in this action. The preliminary injunction, asset freeze, and receivership shall apply to Defendants Health Formulas, LLC; Pure

1    Vitamins, LLC; Longhorn Marketing, LLC; Method Direct, LLC; Weight Loss Dojo, LLC; VIP

2    Savings, LLC; DJD Distribution, LLC; MDCC, LLC; Jason Miller; and Danelle Miller, and shall

3    not apply to Defendants Brandon Chapnick, Keith Smukler, and Chapnick, Smukler & Chapnick,

4    LLC, as these Defendants have agreed to a separate Stipulated Preliminary Injunction (ECF No.

5    61). In addition, the preliminary injunction shall not apply to the entities not named in the

6    original Complaint but later identified in the Temporary Receiver's Report as related entities and

7    subsequently added as Defendants in the Amended Complaint.[1] However, under to the equitable

8    powers of this Court, the asset freeze and receivership shall apply to the entities identified in the

9    Temporary Receiver's Report as related entities, because the Temporary Receiver has produced

10   evidence that these entities were participating in the transfer of assets with Defendants related to

11   Defendants' allegedly unlawful advertising, marketing, and sale of their respective products and

12   that these entities were owned, managed, and controlled by the Millers.

13

14   **II.    BACKGROUND**

15       On October 7, 2014, the Federal Trade Commission (FTC) filed a Complaint against

16   individuals Brandon Chapnick, Keith Smukler, Jason Miller, and Danelle Miller[2] (collectively,

17   the "Individual Defendants") and the following corporations: Chapnick, Smukler & Chapnick,

18   Inc. (CSC); DJD Distribution, LLC; Health Formulas, LLC; Longhorn Marketing, LLC; MDCC,

19   LLC; Method Direct, LLC; Pure Vitamins, LLC; VIP Savings, LLC; and Weight Loss Dojo,

20   LLC (collectively, the "Corporate Defendants"). See ECF No. 1.

21

22       [1] The FTC filed an Amended Complaint on February 5, 2015 in which it named an additional thirty-four entities as Defendants, all but five of which had been identified in the Temporary Receiver's Report. ECF No. 114. However, the FTC's request for a preliminary injunction was filed on October 7, 2014 and was made pursuant to its original Complaint, which did not name these additional entities as Defendants and did not identify many of them by name. Therefore, while the Court's equitable jurisdiction extends to these additional entities and they may be subject to the asset freeze, the preliminary injunction issued in this Order does not apply to these entities as they were not named in the FTC's Complaint or motion. If the FTC seeks a preliminary injunction binding any Defendants named in the Amended Complaint, it must file a motion making that request. Accordingly, unless stated otherwise, all references to "Defendants" in this Order refer to the Defendants named in the FTC's original Complaint.

       [2] Jason and Danelle Miller shall be collectively referred to as the Millers.

1    The Complaint alleges violations of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§

2    45(a), 52; Section 907(a) of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693e(a);

3    Section 4 of the Restore Online Shoppers Confidence Act (ROSCA), 15 U.S.C. § 8403; Section

4    205.10(b) of Regulation E, 12 C.F.R. § 205.10(b); and the FTC's Telemarketing Sales Rule

5    (TSR), 16 C.F.R. Part 310.

6    In the Complaint, the FTC alleges that the Corporate Defendants operated as a common

7    enterprise and conducted business "through an interrelated network of companies that have

8    common ownership, officers, managers, business functions, employees, office locations,

9    telephone numbers, domain registrants, and bank signatories." Compl. ¶ 21. The FTC also

10   alleges that the Individual Defendants "formulated, directed, controlled, had the authority to

11   control, or participated in the acts and practices of the Corporate Defendants that constitute the

12   common enterprise." Id.

13   Beginning in January 2010, the FTC alleges that Defendants, operating through this

14   network of interconnected businesses, engaged in the deceptive and unlawful advertising,

15   marketing, and sale of dietary supplements and other products. Id. ¶¶ 23-30. The FTC claims that

16   these alleged acts constitute violations of the FTC Act, the EFTA, the ROSCA, Regulation E,

17   and the TSR as set forth above. The FTC also argues that the Corporate Defendants are jointly

18   and severally liable under a common enterprise theory. Id. ¶ 21. The Complaint details several

19   specific practices it alleges to be deceptive or otherwise unlawful.

20   First, the FTC claims that Defendants advertise free trials or buy-one-get-one-free

21   promotions of their products that are designed to entice customers into giving Defendants their

22   credit or debit card information. Id. ¶¶ 25, 31. However, once customers have entered this

23   information, Defendants enroll them in "continuity programs" through which customers continue

24   to receive—and continue to be charged for—periodic shipments of Defendants' products until

25   they affirmatively cancel their subscriptions, a payment method known as a "negative option

26   feature." Id. ¶¶ 26, 48. For example, in the case of free trial offers, the FTC alleges that

27   Defendants often prominently advertise one-month supplies of their products. Id. ¶¶ 38-39.

28   However, on many of their products' order pages, Defendants allegedly do not disclose, or only

include disclosures in the fine print, that the trial period lasts for fourteen days and that it runs from the date the product is ordered. Id. ¶¶ 41-44. If the customer has not canceled by the time the trial period ends, customers are charged for the full cost of the product and continue to be charged periodically thereafter for new shipments of the product. Id. ¶¶ 42-43. Defendants allegedly do not inform customers, on their payment pages or anywhere near the "free trial" promotional statements, of the steps they must take to avoid being charged for recurring shipments, and often do not include this information in confirmation emails to customers that are sent after the order has been completed. Id. ¶¶ 45, 47-48.

The Complaint also alleges that Defendants engage in "upselling"—attempting to sell additional products—to customers who order their products over the phone. Id. ¶¶ 3, 27, 56. These upsell products allegedly contain many of the same payment mechanisms as Defendants' other products. Id. ¶ 68. After an introductory or "trial" period, the Complaint states that customers are charged automatically unless they have canceled their subscription to the upsell product, and continue to be charged periodically for new shipments of the upsell product via a negative option feature. Id. ¶ 61, 68. The FTC also alleges that Defendants often state the terms of their upsell offers at an excessive speed, or "gloss over" or vaguely state the terms, and fail to obtain customers' affirmative consent before enrolling them in these "continuity" programs for their upsell products. Id. ¶¶ 57-59, 68.

Next, the FTC asserts that Defendants unreasonably and unlawfully impose restrictive conditions on their refund or cancellation policies. Id. ¶¶ 69-75. The Complaint alleges that in some instances, Defendants have required customers not to open their bottle of product or to obtain an authorization number and mail the product back in time for Defendants to receive it before the expiration of the trial period in order to obtain a refund. Id. ¶¶ 71-72. Defendants also allegedly require customers to call separate numbers to cancel each upsell product for which they have signed up and do not inform customers that despite having cancelled a subscription for one upsell product, they may still be charged for another. Id. ¶ 73. In other instances, the FTC alleges that Defendants have promised refunds to customers but have not provided them, or have provided them only after customers complained to their credit card companies, law enforcement

- 4 -

1    agencies, or the Better Business Bureau. Id. ¶ 75.

2        The FTC further claims that Defendants have made false representations regarding their

3    RKG Extreme and Pure Green Coffee Bean Plus products. Id. ¶¶ 76-79. The Complaint alleges

4    that Defendants have made claims, through print, radio, and television advertisements, that these

5    products will enable customers to lose a substantial amount of weight quickly and without diet or

6    exercise. Id. For example, the FTC states that Defendants have made claims on the website for

7    Pure Green Coffee Bean Plus that customers can "Burn Fat *Without* Diet or Exercise." Id. ¶ 77.

8    The Complaint alleges that Defendants cannot reasonably substantiate the weight-loss claims

9    they make about these products. Id. ¶ 79.

10        Finally, the Complaint asserts that Defendants violate the FTC's Telephonic Sales Rule

11    by initiating repeated outbound calls to consumers who have asked Defendants to stop calling

12    them and by failing to disclose all material terms of their upsell offers. Id. ¶¶ 3, 113-115.

13        On the same day it filed the Complaint, the FTC filed an *ex parte* motion for a TRO with

14    an asset freeze and appointment of a temporary receiver. ECF No. 5. The Court granted the

15    FTC's motion and issued the TRO on October 9, 2014. ECF No. 12. The TRO temporarily

16    enjoined Defendants from (1) failing to adequately disclose all material terms and conditions of

17    their offers, refunds and cancellation policies; (2) making any false or unsubstantiated claims that

18    their products result in weight loss; (3) failing to obtain written authorization or provide

19    customers a written copy for any preauthorized electronic fund transfer; (4) charging any

20    customer over the Internet through a negative option feature without making adequate

21    disclosures of the material terms and conditions, obtaining customers' express informed consent,

22    and providing simple mechanisms to stop recurring charges; (5) failing to disclose all material

23    terms and conditions of Defendants' negative option features for their upsell products sold over

24    the phone; and (6) making outbound calls to persons who have stated that they no longer wish to

25    receive calls from Defendants. Id. at 9-12.

26        In addition, the TRO imposed an asset freeze on all assets owned or controlled by

27    Defendants and on all assets under the control of any other entity that, while not named in the

28    Complaint, was nonetheless owned or controlled by Defendants. Id. at 12-15. The TRO also

appointed Robb Evans & Associates as Temporary Receiver, defined the authority and duties of the Receiver, ordered Defendants to make full financial disclosures to counsel for the FTC and to the Temporary Receiver, and ordered the repatriation of all foreign assets held by or for Defendants. Id. at 15-28.

At the same time the Court issued the TRO, it issued an Order to Show Cause why a preliminary injunction should not issue. ECF No. 12. Defendants filed its response to the TRO and Order to Show Cause on November 4, 2014, and the FTC filed its reply on November 13, 2014. ECF Nos. 54, 59. On November 12, 2014, the Temporary Receiver filed a report of its activities since its appointment. ECF No. 56 (hereinafter "Receiver's Report"). In its report, the Temporary Receiver summarized how it secured Defendants' business premises and provided detailed information on Defendants' business practices and financial activities. Importantly, the Temporary Receiver also identified numerous other companies which, although not named in the FTC's Complaint, are predominantly owned and managed by the Millers and have similar ownership structures as the Corporate Defendants. Receiver's Report at 8. The Temporary Receiver identified the named and unnamed entities, which totaled thirty-six altogether, along with their managers and the percentage of the Millers' ownership in those entities in Tab 1 of its report to the Court. Id. at Tab 1. The Court refers to those entities identified by the Temporary Receiver but not named in the Complaint as the "Unnamed Miller Entities."[3]

The Court held a hearing on November 17, 2014 and subsequently extended the TRO through December 15, 2014 while the parties prepared additional briefing pertaining to the scope of a potential preliminary injunction, in light of the fact that the Court determined that Defendants had not had adequate time to respond to the Temporary Receiver's Report and additional exhibits filed by the FTC in its Reply. On December 4, 2014, following the submission of briefs by the parties and a hearing, the Court ordered a temporary and limited modification of the asset freeze to permit the payment of attorney's fees and living expenses for

---

[3] As discussed above, all of the Unnamed Miller Entities were named as Defendants in the FTC's Amended Complaint. However, unless stated otherwise, the Court limits its discussion of the application of its Order to those Defendants named at the time the FTC requested a preliminary injunction.

the Millers. ECF No. 77. That Order expired on February 28, 2015, except for the disbursement of funds for the Millers' personal expenses, which was extended for one additional month. Minutes of Proceedings, Feb. 18, 2015, ECF No. 121. On March 25, 2015, the Court ordered another temporary modification to the asset freeze to permit the Millers access to funds for personal expenses, health care payments, and child care expenses, but not for attorneys' fees. Order, ECF No. 138. The second modification order shall expire on June 30, 2015. Id. at 5.

In their briefs addressing whether a preliminary injunction should issue and the scope of any such preliminary injunction, the parties dispute several key issues. Specifically, the parties disagree as to the legal standard applying to a preliminary injunction sought by the FTC; whether the FTC has demonstrated probability of success on the merits of its claims; whether the Millers can be held personally liable for violations of the FTC Act; whether the Unnamed Miller Entities constitute a common enterprise with the Corporate Defendants and, if so, whether they can be held jointly and severally liable on the FTC's claims; and whether the asset freeze should apply to the Unnamed Miller Entities.

For the reasons discussed below, the Court issues a preliminary injunction against Defendants Jason and Danelle Miller and against the Original Corporate Defendants except for Chapnick, Smukler, and Chapnick, LLC (CSC). The Court also extends the asset freeze and temporary receivership as to the same Defendants as well as to the Unnamed Miller Entities and any other entities that, in the determination of the Temporary Receiver, fall within the scope of the asset freeze and temporary receivership as described in this Order.

This preliminary injunction shall not apply to CSC, Brandon Chapnick, or Keith Smukler. These Defendants are bound by the Stipulated Preliminary Injunction approved by the Court on November 17, 2014. Stip. Prelim. Inj., Nov. 17, 2014, ECF No. 61. The Stipulated Preliminary Injunction retained many of the provisions of the TRO, including the asset freeze and temporary receivership, but also allowed the stipulating Defendants to resume providing business management and accounting services to clients other than the remaining Defendants or other entities involved in marketing and selling the products described in the FTC's Complaint. Id. at 14-15.

## III.    LEGAL STANDARD

Under Section 13(b) of the Federal Trade Commission Act (FTC Act), the Court may grant the FTC a preliminary injunction whenever the FTC has reason to believe that a defendant is violating or is about to violate any law enforced by the FTC and that an injunction would be in the public interest. 15 U.S.C. § 53(b)(1)-(2).

District courts apply a more lenient standard to the FTC when it is seeking an injunction than they do to private litigants. F.T.C. v. Affordable Media, 179 F.3d 1228, 1233 (9th Cir. 1999). Under the lighter standard, the FTC need not show irreparable harm; it must only demonstrate (1) that it is likely to succeed on the merits and (2) that the equities weigh in favor of an injunction. Id.; F.T.C. v. World Wide Factors, 882 F. 2d 344, 346 (9th Cir. 1989).

Section 13(b) of the FTC Act also "gives the federal courts broad authority to fashion appropriate remedies for violations of the Act," which includes "the authority to grant any ancillary relief necessary to accomplish complete justice." F.T.C. v. Pantron I Corp., 33 F.3d 1088, 1102 (9th Cir. 1994) (citations omitted) (internal quotation marks omitted). This authority to grant ancillary relief encompasses equitable powers such as the ordering of restitution, id., and the freezing of assets, Reebok Intern., Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 560 (9th Cir. 1992). Further, a district court may impose a receivership as a form of ancillary relief pursuant to its equitable powers to "fashion effective relief." S.E.C. v. Wencke, 622 F.2d 1363, 1369 (9th Cir. 1980). The court's power to supervise the receivership and determine appropriate remedies "is extremely broad." S.E.C. v. Capital Consultants, LLC, 397 F.3d 733, 738 (9th Cir. 2005) (internal quotation marks omitted).

## IV.    FINDINGS OF FACT & CONCLUSIONS OF LAW

Upon review of the Complaint and briefs in support of and in opposition to the issuance of a preliminary injunction, and after having heard and considered the parties' positions at oral argument, the Court makes the following findings.

/ / /

### A. The Corporate Defendants and the Unnamed Miller Entities Constitute a Common Enterprise.

"[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." F.T.C. v. Network Servs. Depot, Inc., 617 F.3d 1127, 1142-43 (9th Cir. 2010). In deciding whether a common enterprise exists, courts may consider such factors as whether the companies were under common ownership and control; whether they pooled resources and staff; whether they shared phone numbers, employees, and e-mail systems; and whether they jointly participated in a "common venture" in which they benefited from a shared business scheme or referred customers to one another. Id. at 1243.

The Court concludes, based on the evidence presented at this stage of the case, that the Corporate Defendants (except for CSC) and the Unnamed Miller Entities identified in Tab 1 of the Temporary Receiver's Report (hereinafter collectively referred to as the "Receivership Entities") constitute a common enterprise. The Court bases its conclusion on several findings.

First, the Receivership Entities were under common ownership, management, and control. The Temporary Receiver's analysis indicates that Method Films, Inc., a company co-owned by the Millers, held a majority ownership interest in all but two of the thirty-six Receivership Entities identified by the Temporary Receiver and owned a 49% interest in the remaining two companies, DJD Distribution and MDCC. Receiver's Report at 8, Tab 1. The Millers informed the Temporary Receiver that they "created, organized, and managed the daily operations" in marketing and sales of the Receivership Entities. Id. at 5. The Millers' "management and supervisory activities included selecting and locating products for sale, establishing fulfillment procedures, instituting customer service policies and procedures, and creating, developing, and managing the marketing and sales methodology" of the Receivership Entities. Id. Many of the Receivership Entities had one of the Individual Defendants listed as manager. Id. at Tab 1. The Millers also made the decision to outsource telephone-based customer service and sales for the Receivership Entities to the Philippines and to move to an Internet-based sales platform in 2013, further demonstrating their control of the entities. Id. at 5.

Second, the Court finds that the Receivership Entities pooled resources. The Temporary Receiver's analysis reveals that funds from product sales flowed from the entities responsible for sales up to Method Films, which was "funded by the operations and sales of the Receivership Entities" and "was primarily set up by Mr. and Ms. Miller to receive the profits and compensation from the Receivership Entities." Receiver's Report at 12. From January 1, 2010 through October 16, 2014, Method Films received approximately $12 million in distributions and fees from the profits of the remaining Receivership Entities, $6.82 million of which was distributed to the Millers. Id. at 17. The Receivership Entities also paid approximately $2.4 million to Mr. Chapnick and $962,000 to Mr. Smukler during the same time period. Id. at 16. Moreover, the Temporary Receiver's report indicates that Defendants MDCC and DJD Distribution, which facilitated customer service and product fulfillment, received the vast majority of their income from the other Receivership Entities.  MDCC's only customers were the other Receivership Entities, while DJD Distribution had only one customer that was not a Receivership Entity—a customer which provided less than 2% of DJD's income in 2014. Id. at 15. Both DJD and MDCC received millions of dollars in fees from the other Receivership Entities between 2010 and 2014, which served as their primary income during that time. Id.

Defendants also provided a report from a forensic accountant, Victor Y. Lipnitsky, which provides a case study of how one Receivership Entity pooled resources with others. See Defs.' Supp. Resp. Mot. Prelim. Inj. at Ex. 1, ECF No. 78. Mr. Lipnitsky's report documents in detail the financial activities of Wellness Labs, LLC, an entity identified in Tab 1 of the Temporary Receiver's Report. In Attachments D through G of his report, Mr. Lipnitsky analyzes the inflows and outflows of Wellness Labs's merchant, processing, and operating accounts. This data demonstrates that while the majority of the revenue generated by Wellness Labs between August 2013 and October 2014 came from product sales, the company received approximately $651,490 in investments and loans from the Individual Defendants and from Method Films, the holding company for the remaining Receivership Entities. Id. Ex. 1, Att. E. The report also reveals that revenue flowed from Wellness Labs's merchant and processing accounts into its operating account, where it was then disbursed in part to the Millers through Method Films as

distributions, loan repayment, interest, and as payment for "services." Id. Ex. 1, Att. D-G. Funds were also disbursed from Wellness Labs's operating account to DJD Distribution and MDCC. Id. Ex. 1 at 16.[4]

Finally, the Court finds that the Receivership Entities jointly participated in a common venture. The Receivership Entities—many of which share corporate and business addresses, see Third Supp. Decl. of Carol Jones, Pl.'s Supp. Mot. Prelim. Inj. Ex. 33 at ¶¶ 3-4, Dec. 11, 2014, ECF No. 83—used commonly developed marketing and sales methodologies, fulfillment procedures, and customer service policies and procedures. Receiver's Report at 5. The sales entities utilized third-party brokers to promote their products on affiliate websites, who in turn "forward[ed] ready-to-buy consumers to their sale capture website pages." Id. The sales entities "accept[ed] the sale, and proceed[ed] to charge a customer for the primary and up-sale products, and set in place the continuity fulfillment and billing process." Id. at 5-6. The Receivership Entities jointly tracked orders from customers in a common database. Id. at 2. Further, the FTC provided evidence that the Receivership Entities referred customers to one another by enrolling them in automated payment and negative option programs for additional products once customers agreed to purchase the initial product. See, e.g., TRO Motion Ex. 26, Att. C at 16, 22, 27. Based on this evidence, the Court concludes that the entities identified in Tab 1 of the Temporary Receiver's report jointly participated in a common venture and constitute a common enterprise.

"Where corporate entities operate together as a common enterprise, each may be held liable for the deceptive acts and practices of the others." F.T.C. v. Grant Connect, LLC, 763 F.3d 1094, 1105 (9th Cir. 2014) (citing Network Servs. Depot, 617 F.3d at 1143). However, fundamental principles of due process require that interested parties be given notice and an opportunity to be heard. S.E.C. v. McCarthy, 322 F.3d 650, 659 (9th Cir. 2003) (citations omitted). In this case, the Court finds that the Receivership Entities operate as a common

---

[4] While Defendants argue that these transfers were made as payment for product fulfillment, customer service, and shipping services and were necessary in order for Wellness Labs to operate, the Court finds that they nonetheless constitute evidence of the pooling of resources.

enterprise and that each of them may thus be held liable for the alleged acts of the others. However, the Court does not find it appropriate at this time to enjoin any of the Unnamed Miller Entities, none of which were named in the FTC's Complaint.

There are two reasons for this conclusion. First, the FTC did not request that a temporary restraining order or preliminary injunction issue against the Unnamed Miller Entities. The FTC's request for preliminary injunctive relief was made only against the Defendants named in the Complaint. See Pl.'s Ex Parte Emer. Mot. TRO at 2-3, Oct. 7, 2014, ECF No. 5 (requesting an order requiring *Defendants* to show cause why this Court should not issue a preliminary injunction against them). Second, the Unnamed Miller Entities have not yet had an opportunity to respond to the allegations made in the FTC's motion or to the arguments made in subsequent briefing to the Court and at the preliminary injunction hearing. While the Court does not foreclose the possibility of extending the preliminary injunction to apply to the Unnamed Miller Entities at a later stage in this case, the Court will not do so absent a request by the FTC and an opportunity for the Unnamed Miller Entities (and any other related entities the FTC may seek to enjoin) to present evidence and argument as to why the injunction should not apply to them.

In sum, the Court preliminarily finds that the entities identified in Tab 1 of the Temporary Receiver's report constitute a common enterprise. Only those Defendants that were named in the Complaint are bound by the preliminary injunction, although the remaining Receivership Entities are nonetheless subject to the asset freeze and receivership pursuant to the Court's equitable powers.

## B. The FTC Need Only Make a Reduced Showing to Obtain a Preliminary Injunction.

When the FTC seeks an injunction, it need only show that it is likely to succeed on the merits and that the balance of equities weigh in favor of an injunction. F.T.C. v. Affordable Media, 179 F.3d 1228, 1233 (9th Cir. 1999); F.T.C. v. World Wide Factors, 882 F. 2d 344, 346 (9th Cir. 1989). Defendants argue that this case is subject to Section 13(b)'s second proviso and that under this proviso, the FTC would have to demonstrate that an injunction is warranted under

1    traditional equitable standards. See Defs.' Opp'n to Temp. Restraining Order [Defs.' Opp'n] at

2    12-15. While the Court agrees that this is a "proper case" to which the second proviso of Section

3    13(b) applies, the Court finds that a more relaxed burden nonetheless applies to the FTC here.

4         Section 13(b) of the FTC Act expressly provides for a lighter burden when the FTC is

5    seeking an injunction "pending the issuance of a complaint by the Commission" until such time

6    as the complaint is dismissed by the FTC or set aside by a reviewing court. 15 U.S.C. § 53(b)(2).

7    Alternatively, in "proper cases," the FTC may seek a permanent injunction in the district court

8    pursuant to the traditional equitable standards. F.T.C. v. Evans Products Co., 775 F.2d 1084,

9    1086 (9th Cir. 1985). However, in statutory enforcement actions by the FTC, irreparable injury is

10   presumed. World Wide Factors, 882 F.2d at 347; see also Meyer v. Portfolio Recovery

11   Associates, LLC, 707 F.3d 1036, 1044 (9th Cir. 2012) (citing prior Ninth Circuit case law

12   holding that the traditional equitable standards do not apply in statutory enforcement actions

13   where the statute specifically provides that injunctive relief may be sought).

14        In both Affordable Media and World Wide Factors, the Ninth Circuit applied the lighter

15   burden to the FTC's request for a preliminary injunction following the filing of a complaint in

16   the district court and granting of a temporary restraining order; in Affordable Media, the TRO

17   was granted ex parte. See 179 F.3d at 1232-33; 882 F.2d at 346. The Court finds that these cases

18   control the instant action, and thus the lighter burden applies to the FTC's request for a

19   preliminary injunction. Defendants' sole case challenging these precedents is an unpublished

20   district court case with no precedential effect in this Court. See F.T.C. v. NAFSO VLM, Inc.,

21   No. CIV S-12-0781, 2012 WL 1131573, at *1 (E.D. Cal. Mar. 29, 2012). Therefore, the FTC

22   must demonstrate likelihood of success on the merits and that the balance of equities favors an

23   injunction.

24

25        **C.  The FTC is Likely to Succeed on the Merits of Its Claims.**

26        "[T]he burdens at the preliminary injunction stage track the burdens at trial." Gonzales v.

27   O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (U.S. 2006). Thus, the

28   burden is on the FTC to demonstrate that it is likely to prevail on its claims that Defendants

violated Sections 5(a) and 12 of the FTC Act, Section 907(a) of the EFTA, Section 4 of the ROSCA, Section 205.10(b) of Regulation E, and the FTC's Telemarketing Sales Rule. "Because irreparable injury must be presumed in a statutory enforcement action, the district court need only . . . find some chance of probable success on the merits." World Wide Factors, 882 F.2d at 347 (internal quotation marks omitted).

The Court finds that the FTC has satisfied its burden of demonstrating probable success on the merits of its claims, and considers each claim in turn with respect to Defendants.[5] The liability of the Millers is discussed in Section IV-E below.

### 1. Deceptive Acts or Practices

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An act or practice is deceptive if (1) it is a representation, omission, or practice, (2) that will likely mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. F.T.C. v. Gill, 265 F.3d 944, 950 (9th Cir. 2001) (internal quotation marks omitted). Representations need not be express to be deceptive; implied claims are covered under the statute as well. F.T.C. v. Figgie Int'l, Inc., 994 F.2d 595, 604 (9th Cir. 1993).

A representation may be deceptive or misleading "by virtue of the net impression it creates even though [it] also contains truthful disclosures." F.T.C. v. Cyberspace.com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006). A representation, omission, or practice is material if it involves information important to consumers and likely to affect their choice of product or their conduct regarding a product. Id. at 1201. "Express product claims are presumed to be material." Pantron I, 33 F.3d at 1095-96.

The Court finds that the FTC has met its burden of demonstrating likelihood of success on the merits of this claim in three ways. First, the FTC has provided evidence that the payment pages on Defendants' websites contain inadequate disclosures about the material terms and

---

[5] Throughout this Section discussing the merits of the FTC's claims, all references to "Defendants" are to the Corporate Defendants named in the Complaint, with the exception of CSC.

conditions of their offers. Many of Defendants' websites offer sample bottles or one-month supplies of a product. See Pl.'s *Ex Parte* Mot. For TRO, Oct. 7, 2014, ECF No. 5 ("TRO Motion"), Ex. 23, Att. C, D, F. Several of Defendants' websites also offer "free trials" or use language such as "risk free." TRO Motion Ex. 24, ¶ 8. However, many of Defendants' websites do not adequately disclose that customers will be charged the full price of the product if they do not cancel within fourteen days despite the fact that the offer often states that it is for a month's supply of product, or that customers will be charged periodically for new shipments of product unless they affirmatively take action to cancel. In addition, Defendants' websites do not adequately disclose that the trial period begins from the date the product is ordered rather than the date it is received.

Second, the FTC has produced evidence that Defendants have inadequately disclosed the terms and conditions of their cancellation and refund policies. Several of Defendants' websites fail to adequately disclose that customers may not obtain a refund for "trial" products if fourteen days have elapsed and they have been charged the full amount. See TRO Motion Ex. 23, Att. B, E, F, G. For products offering a thirty-day trial period or money-back guarantee, Defendants' websites fail to adequately disclose that the thirty days begin on the date the product is ordered rather than the date it is received and that the product must be unopened in order to be eligible for a refund. See TRO Motion Ex. 24, Att. A, C, D, E, F.

Third, Defendants also fail to adequately disclose that they must separately cancel or request a refund from each product and upsell product separately, fail to disclose that upsell products are sold and processed through separate entities, and impede customers' efforts to contact each upsell company. See TRO Motion Ex. 26, Att. C at 27-34; id., Att. G at 12-14, 16; id., Att. I at 6-9. Defendants fail to disclose that for certain upsell products, refunds are not available for charges after the thirty-day trial period even if the customer does not realize that he or she has been charged and does not believe that he or she has consented to the charge. See TRO Motion Ex. 18, ¶ 9; TRO Motion Ex. 26, Att. K at 7-9

   *a.* ***Health Formulas, LLC***: The Complaint alleges that Defendant Health Formulas, LLC ("Health Formulas"), also doing business as Simple Pure Nutrition, markets and

sells dietary supplements and healthcare-related products bearing the Simple Pure name, among others. Compl. ¶ 8. The FTC's evidence shows that Health Formulas, under the name SimplePure Nutrition, offers a thirty-day money-back guarantee in connection with its AltaTrim product. TRO Motion Ex. 24, Att. A. An icon stating "30 Day Money Back Guarantee" is prominently displayed in the upper right-hand corner of each page of the AltaTrim website. Id. The Court finds that the net impression created by these guarantees is that customers will have a full thirty days after purchase to try the product and will have the opportunity for a refund if they are not satisfied. On the Customer Care page of the website, however, is an explanation stating that customers who are seeking a refund must "return the *unopened* bottles within 30 days *from the date of shipment*." Id. (emphasis added). In its Terms and Conditions (which it is unclear whether consumers are required to read before purchasing), Health Formulas also states: "We do not ever accept opened product for return or refund." Id. The Customer Care page further states that orders typically take five to ten business days to arrive once they are shipped via standard shipping. Id. Thus, what initially appears to be a thirty-day guarantee may actually be significantly less, as orders may take up to two full weeks to arrive—time that is deducted from the thirty days customers are given to decide whether they want to keep the product. Further, the Court finds that customers are led to believe that they can obtain refunds even for opened products (since they would otherwise be unable to decide whether they were satisfied), when in actuality they cannot. The evidence shows that Health Formulas makes similar statements on the Customer Care page of its website advertising its Raspberry Ketone product. Id. at Att. H.

The evidence before the Court, which Defendants have not refuted, also demonstrates that Health Formulas fails to make adequate disclosures via telephone regarding the procedure for obtaining refunds and may actually affirmatively obstruct customers from doing so. An FTC investigator placed several calls to Defendant Health Formulas. The transcripts from these calls reveal that Health Formulas, under the name Simple Pure Nutrition, attempts to "upsell" other products—including a fitness DVD program, a "VIP and grocery savings" program, and a magazine subscription program—after the caller has purchased the primary product. See TRO Motion Ex. 26, Att. C at 16-34. Despite promoting the upsell products during the initial call,

however, Simple Pure Nutrition did not cancel all of the upsell product subscriptions when the caller contacted its customer service department and requested that it do so. The caller continued receiving charges for the magazine rewards program, despite the Simple Pure representative informing the caller that she would not be receiving any more charges on her account. TRO Motion Ex. 26 at ¶¶ 24-31; id., Att. G at 12-14. When the caller contacted Simple Pure again, the representative told her that the charges for the magazine rewards program were "not our company," that Simple Pure did not "have any idea" of the name of the company responsible for the magazine rewards program charges, and that Simple Pure did not have the phone number the customer needed to call to cancel the magazine rewards program. Id., Att. I at 6-9. Based on this evidence, the Court finds that Health Formulas/Simple Pure's representation that the caller had done all she needed to do to cancel all of the recurring charges to her account was deceptive because it was a material statement or omission that was likely to mislead a customer acting reasonably under the circumstances. The Court therefore finds that the FTC is likely to succeed on its claim of deceptive acts or practices against Health Formulas.

        **b. *Pure Vitamins, LLC***: The FTC alleges that Defendant Pure Vitamins, LLC ("Pure Vitamins") markets and sells dietary supplements and weight loss products, including RKG Extreme and Pure Green Coffee Bean Plus. Compl. ¶ 9. The FTC has shown that Pure Vitamins offers a "1 Month Supply FREE TRIAL" package on the website for their Garcinia Cambogia Extract product. TRO Motion Ex. 23, Att. L. The offer states that customers need only pay shipping to receive a one-month supply of product. Id. These statements create the net impression in customers' minds that they are buying a one-month supply at a discount and that they will not be charged for anything further, or at the very least that they will not be charged until one month has elapsed. In fine print, however, there is a disclosure stating: "You will have 14 days *from your original order date* to see if Pure GC 60 is right for you. If you are unhappy with the product at any time during those 14 days, you must call . . . and cancel your order to avoid being billed for the full cost of the product." Id. (emphasis added). The fine print reveals that, contrary to the impression created by Pure Vitamins' prominently displayed offer language, customers are charged and enrolled in an automatic payment program fewer than

1    fourteen days after receiving the product (due to shipping time). The FTC's evidence shows that

2    Pure Vitamins has made similar statements on its website in connection with its Pure Green

3    Coffee Bean Plus product. Id., Att. T. The Court finds that the FTC is likely to succeed on its

4    claim of deceptive acts or practices against Pure Vitamins by virtue of the net impression Pure

5    Vitamins' statements create.

6              ***c. Longhorn Marketing, LLC***: The Complaint states that Defendant

7    Longhorn Marketing, LLC ("Longhorn Marketing"), also doing business as Men's Health

8    Formulas, LLC, Life Vitamins, and Unleash the Thunder, markets and sells male-enhancement

9    and muscle-building products, including Black Bull, Superior Antler, and Superior Velvet.

10   Compl. ¶ 10. The evidence indicates that Longhorn Marketing offers a "Month Supply" of its

11   Black Bull product on its website. TRO Motion Ex. 23, Att. X. Prominently displayed on the site

12   are the words "ACT NOW TO CLAIM YOUR BOTTLE." Id. On the order page, the price is

13   listed as $0.00 and the word "trial" is not listed in the payment details. Id. At the bottom of the

14   page, the fine print states: "You must pay a shipping and processing fee . . . for us to send you a

15   full 30 day supply of Black Bull. . . . You will have 14 days *from your original order date* to see

16   if Black Bull is right for you. If you are unhappy with the product at any time during those 14

17   days, you must call . . . and cancel your order to avoid being billed for the full cost of the

18   product." Id. (emphasis added). The fine print also states that if customers are satisfied with the

19   product, "then do nothing – we will bill you $ [sic] for your initial order, and every thirty days

20   thereafter we will send you a new 30-day supply of our product, and automatically bill you the

21   low price of $ [sic] + shipping of $4.95." Id. The net impression this creates for consumers is that

22   they are simply buying one bottle of the product containing a one-month supply with no other

23   commitments, when they are actually charged fewer than fourteen days after receiving the

24   product. Additionally, even if customers read and fully understand the fine print, they are not

25   given the full cost of the product or told how much they will be billed, as there is no price listed

26   next to the dollar sign in the fine print. Id. Due to this net impression, the Court finds that the

27   FTC is likely to succeed on its claim of deceptive acts or practices against Longhorn Marketing.

28   / / /

1          *d.  Method Direct, LLC*: The FTC claims that Defendant Method Direct,

2    LLC ("Method Direct"), also doing business as Extamax, LLC, Vitaman Labs, Inc., Vitafit, and

3    Playboy Offer/DVD Entertainment, promotes a male-enhancement product named Extamax and

4    offers a monthly adult DVD program as an upsell to customers who purchase male-enhancement

5    products from Defendants. Compl. ¶ 11. The evidence before the Court shows that Method

6    Direct, doing business as Vitaman Labs, Inc., offers a fourteen-day trial of its ExtaMax product.

7    TRO Motion Ex. 24, Att. C. The product offer page of the website prominently displays the

8    language "Try ExtaMax 14 Days… FREE! (With Enrollment in Home Delivery Plan)." Id. In

9    fine print further down the page is a disclaimer which states: "If you do not cancel the program

10   within the 14 day trial period, you will be shipped a 30 day supply of ExtaMax and charged

11   $59.99 plus $9.99 S/H every month (beginning approximately 17 days after signup) . . . ." Id.

12   Customers are therefore given the net impression that they can purchase a free trial at no or little

13   cost, and if they read the fine print, they are led to believe that they will have two full weeks to

14   evaluate the product and cancel if they are unsatisfied. However, ExtaMax's Terms and

15   Conditions (which are contained in a separate document and do not appear to be required reading

16   for customers) state that orders are shipped within two business days from the purchase date and

17   typically take five to ten business days to arrive once they are shipped via standard shipping. Id.

18   Thus, it is quite possible that a customer could receive the ExtaMax product in the mail *after the*

19   *trial period has ended* and the customer has already been charged for the full amount of the

20   product. Due to this deceptive and misleading representation, the Court concludes that the FTC is

21   likely to succeed on the merits of its Section 5(a) claim against Method Direct.

22         *e.  Weight Loss Dojo, LLC*: The Complaint alleges that Defendant Weight

23   Loss Dojo, LLC ("Weight Loss Dojo"), also doing business as Fitness DVDs, offers a monthly

24   fitness DVD program as an upsell to customers who purchase dietary supplements from

25   Defendants. Compl. ¶ 12. Because the Court has found that the Corporate Defendants (except for

26   CSC) constitute a common enterprise, the FTC is likely to succeed on its claim of deceptive acts

27   or practices against Weight Loss Dojo.

28         *f.  VIP Savings, LLC*: The complaint states that Defendant VIP Savings,

LLC ("VIP Savings"), also doing business as VIP Savings Center, offers a discount card as an upsell to customers who purchase Defendants' other products. Compl. ¶ 13. Because the Court has found that the Corporate Defendants (except for CSC) constitute a common enterprise, the FTC is likely to succeed on its claim of deceptive acts or practices against VIP Savings.

           **g. DJD Distribution, LLC**: The FTC alleges that Defendant DJD Distribution, LLC ("DJD Distribution") serves as a fulfillment company and distributor for the products marketed and sold by Defendants. Compl. ¶ 14. Because the Court has found that the Corporate Defendants (except for CSC) constitute a common enterprise, the FTC is likely to succeed on its claim of deceptive acts or practices against DJD Distribution.

           **h. MDCC, LLC**: The complaint alleges that Defendant MDCC, LLC ("MDCC"), also doing business as Method Direct Call Center, serves as a call center through which Defendants conduct sales via inbound and outbound calls as well as receive customer service telephone calls for their products. Compl. ¶ 15. Because the Court has found that the Corporate Defendants (except for CSC) constitute a common enterprise, the FTC is likely to succeed on its claim of deceptive acts or practices against MDCC.

       2.  <u>False Advertising</u>

      Section 12 of the FTC Act prohibits the dissemination of any false advertisement "for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics." 15 U.S.C. § 52(a)(2). Pursuant to 15 U.S.C. § 52(b), the dissemination of a false advertisement also constitutes a violation of 15 U.S.C. § 45, prohibiting unfair or deceptive acts or practices in or affecting commerce.

      The FTC Act defines "false advertisement" as one that is "misleading in a material respect," taking into account the representations the advertisement makes or suggests as well as any material facts which the advertisement fails to reveal. 15 U.S.C. § 55(a)(1). A claim that a product is effective is "false" under Section 12 of the FTC Act "if evidence developed under accepted standards of scientific research demonstrates that the product has no force beyond its placebo effect." <u>Pantron I</u>, 33 F.3d at 1097. In such a case, a claim that the product is effective

constitutes a false advertisement "even though some consumers may experience positive results." Id. at 1100.[6] An advertisement is misleading "only if it fails to disclose facts necessary to dissipate false assumptions likely to arise in light of the representations actually made" by the advertisement. F.T.C. v. Simeon Mgmt. Corp., 532 F.2d 708, 716 (9th Cir. 1976). Defendants' dietary supplement, muscle-building, male enhancement, and skincare products are "food" or "drugs" as defined for the purposes of the FTC Act. 15 U.S.C. § 55(b)-(c).

   *a.  Health Formulas, LLC & Pure Vitamins, LLC*: The FTC has provided evidence, which Defendants have not controverted, that Defendants Health Formulas (doing business as Simple Pure Nutrition) and Pure Vitamins' claims that their Pure Green Coffee Bean Plus and RKG Extreme products enable weight loss without diet or exercise are false and misleading. See TRO Motion Ex. 27. Specifically, the FTC's evidence concludes that with respect to Pure Green Coffee Bean Plus, the studies cited in Defendants' advertisements contain "numerous design and analytical flaws," including not using obese subjects, improperly attributing changes in body weight to green coffee treatment, using significantly greater dosages than are found in the product, not using placebo controls, and providing irrelevant data or no data at all about weight loss caused by the level of ingredients found in the product. Id. at 12-15. The FTC's evidence concludes that with respect to RKG Extreme, Defendants have cited to no scientific evidence supporting their claims of weight loss without diet or exercise and that no published studies were found from a review of the literature on the effects of raspberry ketone on humans. See id. at 16-17. The Court thus finds that the FTC has met its burden of demonstrating that it is likely to succeed on the merits of this claim, particularly in light of the fact that Defendants have not disputed the FTC's claims or its evidence.

   *b.  Longhorn Marketing, LLC; Method Direct, LLC; Weight Loss Dojo, LLC; VIP Savings, LLC; DJD Distribution, LLC; & MDCC, LLC*: The FTC has not provided

---

[6] The Court notes that, in its brief in support of the temporary restraining order, the FTC has potentially misstated the standard for what is required to prove a violation of Section 12. See TRO Motion at 31-32 ("An advertiser must possess 'competent and reliable scientific evidence' to substantiate health-related claims, including weight-loss claims.") (citations omitted). The Court has found no case in this Circuit adopting the "competent and reliable scientific evidence" standard advocated by the FTC.

evidence that the remaining corporate Defendants made false or misleading claims regarding the products they marketed, sold, distributed, or promoted. However, because the Court has found that the Corporate Defendants (except for CSC) constitute a common enterprise, the FTC is likely to succeed on its claim of false advertising against them.

### 3. Preauthorized Debiting of Consumers' Accounts

Section 907(a) of the Electronic Fund Transfer Act (EFTA) states that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). A "preauthorized electronic fund transfer" is defined as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(10).

One of the EFTA's implementing regulations, Regulation E, states that preauthorized electronic fund transfers from consumer accounts must be authorized in writing and signed or similarly authenticated by the consumer and that the person obtaining authorization shall provide a copy to the consumer. 12 C.F.R. § 205.10(b). The Federal Reserve's Official Staff Commentary to Regulation E states that the terms of a preauthorized transfer must be "clear and readily understandable" and that the authorization "should evidence the customer's identity and assent to the authorization." 12 C.F.R. Part 205, Supp. I, ¶ 10(b), cmts. (5), (6).

The Court finds that the FTC has met its burden of demonstrating likelihood of success on the merits of this claim. The FTC has provided evidence that Defendants engaged in recurring electronic fund transfers from consumers' credit or debit cards without obtaining the proper written authorization and without providing a copy to the consumer when made and that the terms of Defendants' preauthorized transfers are not clear and readily understandable.

**a.  *Pure Vitamins, LLC*:** The evidence reveals that Pure Vitamins does not clearly provide a place for the customer to electronically sign and agree to the terms of the preauthorized electronic transfer mechanism on the website for its Garcinia Cambogia Extract product. The order page for Garcinia Cambogia offers a "1 Month Supply FREE TRIAL – just pay shipping," and provides fields for the customer to input his or her shipping address and credit card information. TRO Motion Ex. 24, Att. N. It also provides a box for customers to

check which appears to serve as an indicator that the customer agrees to the terms and conditions of the offer. Id. However, the disclosure that customers will be billed monthly in the amount of $79.97 if they do not cancel the product within fourteen days of ordering is located in fine print below and to the left of the "Order Now" button. Id. This disclosure is also included in a separate Terms and Conditions document, but customers do not appear to be required to read that document before ordering. Id. The Court finds that the FTC is likely to succeed on the merits of its EFTA claim against Pure Vitamins because the terms of its preauthorized fund transfer mechanism are not clear and readily understandable and because checking the terms and conditions box does not constitute proper authorization by the consumer.

      ***b. Longhorn Marketing, LLC***: The FTC's evidence shows that Longhorn Marketing does not clearly provide a place for the customer to electronically sign and agree to the terms of the preauthorized electronic transfer mechanism on the website for its Black Bull product. Longhorn Marketing also fails to provide customers with a copy of the authorization via a confirmation email or other method. The order page of the website selling Black Bull does not clearly state that by inputting their credit card information, customers are authorizing recurring electronic fund transfers. TRO Motion Ex. 23, Att. X. The confirmation email sent following purchase merely states that the customer has ordered "Black Bull (Trial Month Supply)" for $6.95. TRO Motion Ex. 24, Att. LL. The text of the email states that "[t]he shipping charge you have authorized today will appear on your credit card statement as Black Bull . . . ." Id. The confirmation email gives no indication that the customer has consented to be enrolled in an automatic payment plan and will be so enrolled unless she takes action within fourteen days of the order. The FTC is therefore likely to prevail on its claim that Longhorn Marketing has violated the EFTA.

      ***c. Health Formulas, LLC; Method Direct, LLC; Weight Loss Dojo, LLC; VIP Savings, LLC; DJD Distribution, LLC; & MDCC, LLC***: The FTC has not provided evidence that the remaining Corporate Defendants committed specific violations of the EFTA. However, because the Court has found that the Corporate Defendants (except for CSC) constitute a common enterprise, the FTC is likely to succeed on the merits of this claim against them.

1                    4.  <u>Negative Option Marketing</u>

2           Section 4 of the Restore Online Shoppers Confidence Act (ROSCA) prohibits the

3  charging of any consumer in an Internet transaction through a negative option feature unless the

4  person charging (1) provides text clearly and conspicuously disclosing all material terms of the

5  transaction before obtaining the consumer's billing information, (2) obtains the consumer's

6  express informed consent before charging the consumer's card or account, and (3) provides

7  simple mechanisms for the consumer to stop recurring charges. 15 U.S.C. § 8403. A "negative

8  option feature" is defined as "an offer or agreement to sell or provide any goods or services, a

9  provision under which the customer's silence or failure to take an affirmative action to reject

10  goods or services or to cancel the agreement is interpreted by the seller as acceptance of the

11  offer." 16 C.F.R. § 310.2(u).

12           The Court finds that the FTC has met its burden of demonstrating likelihood of success

13  on the merits of this claim. The FTC has provided evidence that Defendants' recurring payment

14  plans, in which customers are automatically enrolled and through which they are charged if they

15  do nothing, constitute negative option features within the meaning of 16 C.F.R. § 310.2 and that

16  they violate the ROSCA in several ways.

17           First, Defendants' explanations of their negative option features are not clear and

18  conspicuous disclosures of the material terms of the transaction to which they apply. These

19  explanations are either buried in fine print on the payment page of Defendants' websites or stated

20  in separate Terms and Conditions documents that consumers are not required to read. Second,

21  these inadequate disclosures constitute evidence that Defendants often do not obtain consumers'

22  express informed consent before charging their cards or accounts. Third, the FTC has provided

23  evidence that Defendants do not provide simple mechanisms for consumers to stop recurring

24  charges, as the mechanism is not stated on Defendants' product order pages or in confirmation

25  emails giving the details of each online transaction.

26           ***a. Health Formulas, LLC*:** The FTC has provided a declaration from a

27  customer of Health Formulas (doing business as Simple Pure Nutrition) attesting that when

28  ordering a trial supply of Garcinia Cambogia, "[a]t the end of the process, I did not see anything

on the website indicating that I had to contact Simple Pure Nutrition to cancel the product by a certain date or time. I would never have agreed to sign up for a trial sample if I knew I was going to be enrolled in an automatic membership program." Decl. of Melinda Stone, TRO Motion Ex. 15, ¶ 4. In addition to this evidence, the Court has found that the Corporate Defendants (except for CSC) constitute a common enterprise. Therefore, the FTC is likely to succeed on the merits of its ROSCA claim against Health Formulas.

      ***b. Pure Vitamins, LLC:*** Pure Vitamins offers a "1 Month Supply FREE TRIAL" package on the website for their Garcinia Cambogia Extract product. TRO Motion Ex. 23, Att. L. The offer states that customers need only pay shipping to receive a one month supply of the product. <u>Id.</u> In fine print, however, there is a disclosure stating: "If you are satisfied with our product, *then do nothing – we will bill you $79.97 for your initial order*, and every thirty days thereafter we will send you a new 30-day supply of our product, *and automatically bill you* the low price of $79.97 + shipping of $4.95." <u>Id.</u> (emphases added). The full set of Terms and Conditions are provided on a separate page that does not appear to be required reading for customers. The Terms and Conditions reiterate the fine print. Thus, the material terms of the negative option feature are hidden in the fine print, while the larger text on the order page states that customers will receive a free one-month trial if they simply pay for shipping.

     The FTC has also provided a declaration from a customer of Pure Vitamins attesting that when she ordered a trial supply of Garcinia Cambogia, she "read the terms and did not see what the cost of the product would be or that [she] would be entered into a contract for additional orders of the product." Decl. of Loanna Hernandez, TRO Motion Ex. 8, ¶ 2. The customer's declaration also states that "[t]he email receipt did not say anything about a monthly contract with the company." <u>Id.</u> ¶ 8; <u>see also</u> Decl. of Pamela Williams, TRO Motion Ex. 19, ¶ 8 (when ordering Garcinia Cambogia from Pure Vitamins, "[t]he terms of the return policy and auto ship program surprised [the customer] because they had not been mentioned when [she] ordered the product."). The Court finds that the FTC is likely to succeed on its ROSCA claim against Pure Vitamins because its disclosures are not clear and conspicuous and cannot serve as the basis for customers' express, informed consent.

1          **c.  Longhorn Marketing, LLC:** The FTC's evidence shows that when an

2   investigator made a purchase of Longhorn Marketing's Black Bull product, the order

3   confirmation email stated that a purchase of "Black Bull (Trial Month Supply)" was made for a

4   total of $6.95, but did not give any information disclosing that the purchaser had entered into a

5   negative option feature or how recurring charges could be stopped. TRO Motion Ex. 24, Att. LL.

6   Thus, the Court finds that the FTC is likely to succeed on the merits of its ROSCA claim against

7   Longhorn Marketing.

8          **d.  Method Direct, LLC; Weight Loss Dojo, LLC; VIP Savings, LLC; DJD**

9   **Distribution, LLC; & MDCC, LLC:** The FTC has not provided evidence that each of the

10  remaining corporate Defendants committed specific violations of the ROSCA. However, because

11  the Court has found that the Corporate Defendants (except for CSC) constitute a common

12  enterprise, the FTC is likely to succeed on the merits of this claim against them.

13          5.  Telemarketing Practices

14          The FTC's Telemarketing Sales Rule (TSR) prohibits sellers and telemarketers from

15  failing to clearly and conspicuously disclose, before a consumer consents to pay, the total costs

16  of the goods or services at issue and their quantity, as well as all material terms and conditions of

17  the seller's refund or cancellation policy, if the seller makes a representation about that policy or

18  has a policy of not giving refunds or cancellations. 16 C.F.R. § 310.3(a)(1). The TSR also

19  proscribes sellers and telemarketers from failing to clearly and conspicuously disclose, or from

20  misrepresenting, any material terms and conditions of a negative option feature. 16 C.F.R.

21  § 310.3(a)(1)(vii), (a)(2)(ix). In addition, the TSR prohibits the initiating of any outbound

22  telephone call to a person who has previously stated that she does not wish to receive calls from

23  that seller or to a person whose telephone number is on the FTC's do-not-call registry. 16 C.F.R.

24  § 310.4(b)(1)(iii)(A), (B). The Court finds that Plaintiff has met its burden of demonstrating

25  likelihood of success on the merits of these claims.

26          **a.  Health Formulas, LLC:** As discussed above, Health Formulas, under the

27  name Simple Pure Nutrition, attempts to "upsell" other products, including a fitness DVD

28  program, a couponing program, and a magazine subscription program, after the caller has

purchased the primary product. <u>See</u> TRO Motion Ex. 26, Att. C at 16-34. The evidence shows that when an FTC investigator called to purchase a product from Simple Pure Nutrition, the company promoted the upsell products during the call. <u>Id.</u> When attempting to upsell a product called VIP and Grocery Savings, the representative stated "you have a full 14 days to try" the product, but did not advise the customer that she must take affirmative action to avoid recurring charges. TRO motion Ex. 26, Att. C at 23-24. The representative told the investigator "when you see for yourself how much money you'll save, simply do nothing," but to call customer service "if for any reason you wish to discontinue" the program. <u>Id.</u>

When the caller attempted to call back to cancel the upsell product subscriptions and specifically asked whether those recurring charges had been stopped, the Simple Pure representative told the caller that she had successfully canceled all of the subscriptions and that she would not be receiving any future charges in her account. <u>Id.</u>, Att. G at 12-14. However, the FTC investigator continued to receive charges for a shipping rewards program and the magazine subscription program. TRO Motion Ex. 26, ¶¶ 28-31. When she called Simple Pure again, the representative told her that the charges for the magazine rewards program were "not our company," that Simple Pure did not "have any idea" of the name of the company responsible for the magazine rewards program charges, and that Simple Pure did not have the phone number the investigator needed to call to cancel the magazine rewards program. <u>Id.</u>, Att. I at 6-9. The investigator then called the number for the magazine rewards program and was told that the company does not "refund past membership charges," even though the investigator told the representative she had not received any magazines at all during the "trial" period. <u>Id.</u>, Att. K at 7-9. The FTC has also provided declarations from consumers who were given similarly vague or misleading statements by Simple Pure representatives regarding cancelling memberships in upsell product continuity programs. <u>See</u> Decl. of Lynda Bessinger, TRO Motion Ex. 2; Decl. of Scott Reimers, TRO Motion Ex. 13, ¶¶ 9-11.

In addition, the evidence demonstrates that Health Formulas, doing business as Simple Pure Nutrition, initiated outbound calls to individuals who repeatedly requested that the company stop calling them or informed the company that their numbers were listed on the FTC's do-not-

1    call registry. See Decl. of Meghann Awtry, TRO Motion Ex. 1; Decl. of Jeffrey Braden, id. at

2    Ex. 3; Decl. of Tarron Jackson, id. at Ex. 9; Decl. of Janet Swingle, id. at Ex. 16.

3             The Court finds that the FTC is likely to succeed on its claim that Health Formulas

4    violated the TSR by (1) failing to clearly and conspicuously disclose the material terms and

5    conditions of the refund policy for its upsell products, in particular that customers must cancel

6    each upsell product separately and that the upsell companies may not issue refunds; (2) by failing

7    to disclose the phone numbers customers need to call to cancel those products; and (3) by

8    initiating outbound telephone calls to individuals who previously stated their desire not to

9    receive calls from Health Formulas or whose numbers are listed on the FTC's do-not-call

10   registry.

11            **b.  Pure Vitamins, LLC:** The FTC has produced evidence suggesting that

12   Pure Vitamins does not clearly and conspicuously inform customers, before they consent to pay,

13   of the material terms and conditions of the negative option features of their upsell products. One

14   of Pure Vitamins' customers attests that she was not told of the negative option feature until after

15   giving her debit card information to the sales representative. Decl. of Jessica Ward, TRO Motion

16   Ex. 17, ¶¶ 6-8. In addition, the evidence demonstrates that Pure Vitamins initiated outbound calls

17   to individuals who repeatedly requested that the company stop calling them or informed the

18   company that their numbers were listed on the FTC's do-not-call registry. See Decl. of Katherine

19   R. Moffett, TRO Motion Ex. 12. The Court finds that the FTC is likely to prevail on the merits of

20   its claim against Pure Vitamins for violation of the TSR.

21            **c.  Longhorn Marketing, LLC:** The evidence shows that Longhorn

22   Marketing initiated repeated outbound calls regarding its Black Bull product to individuals who

23   repeatedly asked the company to stop calling or told the company that their numbers were listed

24   on the FTC's do-not-call registry. See Decl. of Martin T. Davidson, TRO Motion Ex. 4; Decl. of

25   Michael Filowiak, id. at Ex. 5; Decl. of Lori Guirard, id. at Ex. 7. Thus, the FTC has shown it is

26   likely to succeed on the merits of its TSR claim against Longhorn Marketing.

27            **d.  Method Direct, LLC:** According to the evidence, at least one consumer

28   has attested that Method Direct initiated repeated outbound calls regarding its Extamax product

despite the consumer informing the company that his number was listed on the FTC's do-not-call registry. See Decl. of Erick Gottlieb, TRO Motion Ex. 6. Based on this evidence, combined with the Court's finding that the corporate Defendants constitute a common enterprise, the FTC is likely to succeed on the merits of its TSR claim against Method Direct.

    *e.*   ***Weight Loss Dojo, LLC; VIP Savings, LLC; DJD Distribution, LLC; & MDCC, LLC:*** The FTC has not provided evidence that each of the remaining Corporate Defendants committed specific violations of the TSR. However, because the Court has found that the Corporate Defendants (except for CSC) constitute a common enterprise, the FTC is likely to succeed on the merits of this claim against them

    In sum, the Court finds that the FTC is likely to succeed on its claims that Defendants violated Section 5(a) of the FTC Act by engaging in unfair or deceptive acts or practices, that Defendants disseminated false advertisements in violation of Section 12 of the FTC Act, that Defendants' practices regarding preauthorized debiting of accounts and negative option marketing violated the EFTA and the ROSCA, and that Defendants' telemarketing practices violated the TSR.

### D.  The Balance of the Equities Favors Granting a Preliminary Injunction.

    In balancing the equities, public equities receive far greater weight than private equities. Affordable Media, 179 F.3d at 1236. Public equities include economic benefits and competitive advantages for consumers, F.T.C. v. Warner Communications, Inc., 742 F.2d 1156, 1165 (9th Cir. 1984), and effective relief for the FTC, World Wide Factors, 882 F.2d at 347. When the FTC demonstrates a likelihood of success on the merits, "a countershowing of private equities alone does not justify denial of a preliminary injunction." Warner Communications, 742 F.2d at 1165.

    The Court finds that the public equities are substantial and outweigh the private equities in this case. The FTC has established that it is likely to be able to prove that Defendants engaged in multiple deceptive business practices to the detriment of consumers across the country and that its ability to provide restitution to consumers will be severely impaired by the denial of an

injunction. See id. ("A denial of a preliminary injunction would preclude effective relief if the Commission ultimately prevails and divestiture is ordered."). While the Millers' claims that they are unable to support family members, pay child support and buy groceries are serious considerations, these concerns are mitigated by the Millers' ability to seek other employment and by this Court's temporary modifications of the asset freeze to permit the limited release of funds for certain purposes, including living expenses. See Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009) (finding that the district court correctly balanced hardships where "any prejudice to Couturier would be substantially mitigated by limiting the injunction to permit Couturier to cover normal living expenses and legal fees . . . .") (internal quotation marks omitted). Therefore, the balance of equities favors the FTC.

### E. Defendants Danelle and Jason Miller Are Subject to Personal Liability for Violations of the FTC Act.

Personal liability for violations of the FTC Act can fall into two categories: liability for injunctive relief and liability for monetary relief. Individuals are liable for injunctive relief if they directly participate in the deceptive acts or have the authority to control them. F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997); F.T.C. v. Stefanchik, 559 F.3d 924, 931 (9th Cir. 2009). To subject an individual to monetary liability, there must be an additional showing: that the individual had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud and intentionally avoided the truth. Publ'g Clearing House, 104 F.3d at 1171; Stefanchik, 559 F.3d at 931. Reckless indifference can be found if the defendant ignored or failed to investigate "numerous warning signs" of dishonest or fraudulent conduct. F.T.C. v. Network Servs. Depot, Inc., 617 F.3d 1127, 1141 (9th Cir. 2010).

First, the Court finds that the Millers are liable for injunctive relief for violations of the FTC Act. The Temporary Receiver's Report make clear that Jason and Danelle Miller directly participated in the deceptive acts and had authority to control them. The Temporary Receiver stated that the Millers "jointly manage and operate" marketing and sales activity and keep

records on their laptop computers. Receiver's Report at 4. The Temporary Receiver provided evidence that the Millers own at least 70% of all except two of the Receivership Entities through their holding company, Method Films, Inc., and that they possess a 49% ownership interest in the remaining two entities (DJD Distribution and MDCC). Id. at Tab 1. The Millers also acknowledged in interviews with the Temporary Receiver "that they created, organized, and managed the daily operations of the marketing and sales activities of the Receivership Entities." Id. at 5. The Millers' involvement in daily operations of the Receivership Entities included "selecting and locating products for sale, establishing fulfillment procedures, instituting customer service policies and procedures, and creating, developing, and managing the marketing and sales methodology." Id. In addition, the Millers made the decision to outsource their customer service and telephone sales to call centers in the Philippines and to shift to an Internet-driven sales model. Id. Thus, it is evident that the Millers are personally liable for injunctive relief for violations of the FTC Act.

Second, the Court determines that the Millers are liable for monetary relief for FTC Act violations. The evidence produced by the Temporary Receiver and the FTC demonstrates that the Millers acted with reckless indifference to truth or falsity or an awareness of a high probability of fraud and an intentional avoidance of the truth. In an interview with the Temporary Receiver, the Millers confirmed their business practices of offering upsell products, enrolling customers in automatic recurring payment plans, and imposing negative option features on consumers. Receiver's Report at 5. Moreover, Jason Miller "state[d] during the interview that eventually 'everyone cancels,'" with customers canceling after approximately 2.2 months on average. Id. at 6. The Millers also informed the Temporary Receiver that they believed that the chargeback rate for the products sold by their companies, except for Peak Nitric Oxide, were about 3% of sales. Id. at 15. The FTC provided a declaration from a manager of Visa's Merchant Chargeback Monitoring Program who indicated that "merchant chargeback rates of 1% and higher can be an indication of . . . unauthorized charges to a cardholder's account and deceptive marketing practices, such as incorrect statements regarding an offer or a failure to disclose clearly and conspicuously the terms and conditions of an offer." Decl. of Andrew Chen, Pl.'s Reply Supp.

Prelim. Inj. Ex. 31 at 3, Nov. 13, 2014, ECF No. 59 ("FTC Reply"). The declaration further states that the merchant's bank is notified when a merchant has over one hundred sales transactions, one hundred chargebacks, and a chargeback ratio of over 1% in a given month. Id. at 2. The FTC has also provided evidence that the Millers handle day-to-day operations of the Receivership Entities, including responding to customer complaints and training employees on complying with credit card chargebacks. See FTC Reply at 26 and Supporting Exhibits. This evidence is sufficient to support a preliminary conclusion that the Millers were recklessly indifferent to or intentionally avoided the possibility of their representations being false or fraudulent.

Defendants argue correctly that merely responding to customer complaints in the normal course of business would typically not be enough to constitute awareness of unlawful business practices. See Defs.' Opp'n Prelim. Inj. at 21, Nov. 4, 2014, ECF No. 54. However, the Millers' degree of awareness surpassed the ordinary practice of responding to the occasional complaint. The Millers received numerous complaints alleging that customers had been billed without authorization and that their offers had not fully disclosed the material terms and conditions of the transaction. They were also aware that "everyone cancels" and that their chargeback ratios far exceeded the point at which Visa would have notified their bank. From this evidence, the Court concludes that the FTC has satisfied its burden of demonstrating that the Millers are subject to liability for injunctive and monetary relief for violations of the FTC Act.

**F. Continuation of the Asset Freeze and Temporary Receivership as to the Entities Found to Constitute a Common Enterprise is Necessary to Ensure Effective Future Relief.**

Although the Court will not extend the preliminary injunction at this time to the Unnamed Miller Entities, the Court does find that it is appropriate and within the Court's inherent equitable power to continue the asset freeze and temporary receivership with respect to the Millers, the Corporate Defendants (except for CSC), the Unnamed Miller Entities (as identified in Tab 1 of the Temporary Receiver's Report), any persons or entities in active concert

1  or participation with any of the Defendants or Unnamed Miller Entities, and any entities owned,
2  managed, or controlled by any of them.

3       District courts are given broad authority under the FTC Act to fashion equitable remedies
4  to the extent necessary to ensure effective relief. Network Servs. Depot, 617 F.3d at 1141-42.
5  Under principles of equity, the fact "that a transferee [of property] was not the original
6  wrongdoer does not insulate him from liability for restitution." Id. at 1142 (citations omitted)
7  (internal quotation marks omitted). Thus, where funds have been "commingled among several
8  participants in the same unlawful enterprise," equitable remedies freezing funds of an enterprise
9  are appropriate even if the FTC does not "demonstrate with exact precision which funds initially
10  came from which companies . . . ." Id. at 1142-43.

11       As discussed in Section IV.A above, the Temporary Receiver's Report establishes that
12  the Receivership Entities commingled funds. Profits from the Receivership Entities' operations
13  flowed up to Method Films, which was a holding company created by the Millers. Receiver's
14  Report at 16. The Temporary Receiver also identified "frequent and voluminous inter-company
15  transactions between the Receivership Entities" which were recorded as income and payouts on
16  these entities' books. Id. at 10, 12. Based on this evidence of commingling of funds, and
17  considering that the Court has preliminarily found the Millers to be personally liable for
18  violations of the FTC Act, that the Millers own a majority interest in all but two of the
19  Receivership Entities, and that the Receivership Entities constitute a common enterprise, the
20  Court finds that it is necessary to continue to freeze their assets and to have the Temporary
21  Receiver manage the entities "to preserve the possibility of effective relief." Reebok Intern., 970
22  F.2d at 560; see also S.E.C. v. Capital Consultants, LLC, 397 F.3d 733, 738 (9th Cir. 2005) ("A
23  district court's power to supervise an equity receivership and to determine the appropriate action
24  to be taken in the administration of the receivership is extremely broad.") (internal quotation
25  marks omitted).

26       Based upon these findings and conclusions, the Court shall issue a preliminary injunction
27  consistent with the definitions set forth below.
28  / / /

## V.      DEFINITIONS

For the purpose of this Preliminary Injunction Order ("Order"), the following definitions shall apply:

1. **"Asset"** means any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property including chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, contracts, mail or other deliveries, shares of stock, securities, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), cash, trusts, including asset protection trusts, and reserve funds or other accounts associated with any payments processed on behalf of any Defendant, including such reserve funds held by a payment processor, credit card processor, or bank, wherever any such asset is located, whether in the United States or abroad.

2. **"Clear and Conspicuous"** or **"Clearly and Conspicuously"** means as follows:

    a.  In print communications, the disclosure shall be presented in a manner that stands out from the accompanying text so that it is sufficiently prominent, because of its type size, contrast, location, or other characteristics, for consumers to notice, read, and comprehend it;

    b.  In communications made through an electronic medium (such as television, video, radio, and interactive media such as the Internet, online services, and software), the disclosure shall be presented simultaneously in both the audio and visual portions of the communication.  In any communication presented solely through visual or audio means, the disclosure shall be made through the same means through which the communication is presented. In any communication disseminated by means of an interactive electronic medium such as software, the Internet, or online services, the disclosure must be unavoidable. Any audio disclosure shall be delivered in a volume and cadence sufficient for consumers to hear and comprehend it. Any visual disclosure shall be presented in a manner that stands out in the context in which it is presented so that it is sufficiently prominent, due to its size and shade, contrast to the background against which it appears, the length of time it appears on the screen, and

its location, for consumers to notice, read, and comprehend it; and

c.  Regardless of the medium used to disseminate it, the disclosure shall be in understandable language and syntax. Nothing contrary to, inconsistent with, or in mitigation of the disclosure shall be used in any communication.

3.  **"Continuity Plans"** means any plan, arrangement, or system under which a consumer is periodically charged for products or services, including access to exclusive websites, without prior notification by the seller before each charge, regardless of any trial or approval period allowing the consumer to cancel the program.

4.  **"Corporate Defendants"** means Health Formulas, LLC, also d/b/a Simple Pure Nutrition; Pure Vitamins, LLC; Longhorn Marketing, LLC, also d/b/a Men's Health Formulas, LLC, Life Vitamins, and Unleash the Thunder; Method Direct, LLC, also d/b/a Extamax, LLC, Vitaman Labs, Inc., Vitafit, and Playboy Offer/DVD Entertainment; Weight Loss Dojo, LLC, also d/b/a Fitness DVDs; VIP Savings, LLC; DJD Distribution, LLC; MDCC, LLC, also d/b/a Method Direct Call Center; and by whatever other names each may be known, and their successors, assigns, affiliates, or subsidiaries, individually, collectively, or in any combination.

5.  **"Defendants"** means the Corporate Defendants and the Individual Defendants, individually, collectively, or in any combination.

6.  **"Document"** includes writing, drawings, graphs, charts, photographs, sound and video recordings, images, Internet sites, Web pages, Web sites, electronic correspondence, including e-mail and instant messages, contracts, accounting data, advertisements (including advertisements placed on the World Wide Web), FTP Logs, Server Access Logs, USENET Newsgroup postings, World Wide Web pages, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, and any other electronically stored information, and other data or data compilations from which information can be obtained directly or, if necessary, after translation into a reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

7.  **"Electronic Fund Transfer"** means any transfer of funds, other than a transaction

originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone. Such term does not include:

    a.   Any check guarantee or authorization service which does not directly result in a debit or credit to a consumer's account;

    b.   Any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer;

    c.   Any transaction the primary purpose of which is the purchase or sale of securities or commodities through a broker-dealer registered with or regulated by the Securities and Exchange Commission;

    d.   Any automatic transfer from a savings account to a demand deposit account pursuant to an agreement between a consumer and a financial institution for the purpose of covering an overdraft or maintaining an agreed upon minimum balance in the consumer's demand deposit account; or

    e.   Any transfer of funds which is initiated by a telephone conversation between a consumer and an officer or employee of a financial institution which is not pursuant to a prearranged plan and under which periodic or recurring transfers are not contemplated.

8. **"Individual Defendants"** means Danelle Miller and Jason Miller, individually, collectively, or in any combination.

9. **"Material"** means likely to affect a person's choice of, or conduct regarding, goods or services.

10. **"Negative Option feature"** means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take an affirmative action

to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer or agreement.

11. **"Outbound Telephone Call"** means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

12. **"Person"** means a natural person, organization, or other legal entity, including a corporation, limited liability company, partnership, proprietorship, association, cooperative, government or governmental subdivision or agency, or any other group or combination acting as an entity.

13. **"Plaintiff"** or **"Commission"** or **"FTC"** means the Federal Trade Commission.

14. **"Preauthorized Electronic Fund Transfer"** means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

15. **"Temporary Receiver"** means the temporary receiver appointed in Section XIII of this Order and any deputy receivers that shall be named by the temporary receiver.

16. **"Receivership Defendants"** means the Corporate Defendants.

17. **"Telemarketer"** means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

18. **"Telemarketing"** means a plan, program, or campaign (whether or not covered by the TSR, 16 C.F.R. Part 310), which is conducted to induce the purchase of goods or services or a charitable contribution by use of one or more telephones.

19. **"Upsell"** means a solicitation for the purchase of any good or service following an initial transaction during a single telephone call.

## ORDER

### I.

### PROHIBITED BUSINESS ACTIVITIES

IT IS THEREFORE ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection

with the sale of any good or service are **hereby preliminarily enjoined from**:

    A.    Failing to disclose, or to disclose adequately, in a Clear and Conspicuous manner, all Material terms and conditions of their offer, including:

        1.    That Defendants will use consumers' credit or debit card information to charge consumers for the initial full month's supply of the products upon the expiration of a limited trial period;

        2.    That Defendants enroll consumers who order the products they sell into membership programs and other programs, including Continuity Plans, that consumers must cancel within a limited time period in order to avoid recurring charges;

        3.    That Defendants will use consumers' credit or debit card information to periodically charge consumers for the membership programs and other programs, including Continuity Plans;

        4.    The cost of the membership programs and other programs, including Continuity Plans, and the frequency and duration of the recurring charges;

        5.    When consumers must cancel the trial and the membership programs and other programs, including Continuity Plans, to avoid further charges; and

        6.    The means consumers must use to cancel the trial and the membership programs and other programs, including Continuity Plans.

    B.    Failing to disclose, or disclose adequately, in a Clear and Conspicuous manner, all Material terms and conditions of their refund and cancellation policy, including that:

        1.    Consumers must take steps to cancel each product and Upsell product separately;

        2.    Consumers must return each product separately by mail, sometimes to different post office boxes;

        3.    Consumers must identify the appropriate and unique customer service telephone number for each of the products, call to obtain so-called "RMA" numbers for each of the products, and affix the "RMA" numbers to their

return packages;

4.      Consumers must obtain tracking or delivery confirmation for each package;

5.      For products bought on a buy-one-get-one free offer, Defendants will not accept the product for return or refund unless it is unopened and in re-sellable condition; and

6.      Defendants' 30-day money back return policy runs from the date of the initial order, rather than the date of receipt.

C.     Making, in any manner, directly or indirectly, expressly or by implication, any false or unsubstantiated representation, including that use of Defendants' products will result in weight loss or reduction of body fat.

## II.

### PROHIBITIONS AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any good or service, are **hereby preliminarily enjoined from**:

A.     Failing to obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer.

B.     Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## III.

### PROHIBITIONS AGAINST UNFAIR AND DECEPTIVE NEGATIVE-OPTION MARKETING PRACTICES ON THE INTERNET

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants,

employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any good or service are **hereby preliminarily enjoined from** engaging in, causing others to engage in, or attempting to engage in, any of the following practices:

      A.    Charging any consumer in an Internet-based sale of a good or service sold through a Negative Option feature without:

           1.    Providing text that Clearly and Conspicuously discloses all Material terms of the transaction before obtaining the consumer's billing information;

           2.    Obtaining a consumer's express informed consent before making any charge; and

           3.    Providing a simple mechanism for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

      B.    Violating the Restore Online Shoppers Confidence Act, 15 U.S.C. §§ 8401-8405.

## IV.

## PROHIBITIONS AGAINST DECEPTIVE AND ABUSIVE TELEMARKETING PRACTICES

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with Telemarketing, are **hereby preliminarily enjoined from** engaging in, causing others to engage in, or assisting other persons to engage in, any of the following practices:

      A.    Failing to disclose truthfully, promptly, and in a Clear and Conspicuous manner, before a consumer pays for the goods or services offered, all Material terms and conditions of the Defendants' Negative Option feature for an Upsell good or service before a consumer incurs a charge for that good or service including:

           1.    That consumers who order any of Defendants' Upsell goods or services will be enrolled into membership program(s) and other program(s), including

Continuity Plans, that consumers must cancel within a limited time period in order to avoid recurring charges;

    2.    That consumers who order any of Defendants' Upsell goods or services will be charged on a recurring basis unless consumers take affirmative action to avoid the charges;

    3.    The date(s) that the Defendants will submit charge(s) for payment; and

    4.    The specific steps consumers must take to avoid further charges.

B.    Initiating any outbound telephone call to a person when that person has previously stated that he or she does not wish to receive an outbound telephone call made by or on behalf of Defendants.

C.    Violating the Telemarketing Sales Rule, 16 C.F.R. Part 310.

## V.

## ASSET FREEZE

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order are hereby temporarily restrained and enjoined from directly or indirectly:

A.    Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any Assets, or any interest therein, wherever located, including outside the United States, that are:

    1.    Owned or controlled, directly or indirectly, by any Defendant(s), in whole or in part, or held, in whole or in part, for the benefit of any Defendant(s);

    2.    In the actual or constructive possession of any Defendant(s);

    3.    Owned, controlled by, or in the actual or constructive possession of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by, or under common control with any Defendant(s), or any other entity acting under a fictitious name owned by or controlled by any Defendant(s),

and any Assets held by, for, or under the name of any Defendant(s) at any bank or savings and loan institution, or with any broker-dealer, escrow agent, title company, commodity trading company, payment processing company, precious metal dealer, or other financial institution or depository of any kind.

B.      Opening or causing to be opened any safe deposit boxes titled in the name of any Defendant(s), or subject to access by any Defendant(s);

C.      Incurring charges or cash advances on any credit card, debit card, or checking card issued in the name, singly or jointly, of any Defendant(s);

D.      Obtaining a personal or secured loan;

E.      Incurring liens or other encumbrances on real property, personal property, or other Assets in the name, singly or jointly, of any Defendant(s); and

F.      Cashing any checks or depositing any money orders or cash received from consumers, clients, or customers of any Defendant(s).

The Assets affected by this Section shall include: (1) all Assets of Defendants as of the time this Order is entered; and (2) for Assets obtained after the time this Order is entered, those Assets of Defendants that are derived, directly or indirectly, from the Defendants' activities as described in the Commission's Complaint, including the activities of any Receivership Defendant. This Section does not prohibit transfers to the Temporary Receiver, as specifically required in Section XV (Delivery of Receivership Property), nor does it prohibit the repatriation of foreign Assets, as specifically required in Section VIII (Repatriation of Foreign Assets and Documents) of this Order.

## VI.

### DUTIES OF ASSET HOLDERS

IT IS FURTHER ORDERED that any financial or brokerage institution, credit card processing company, payment processor, merchant bank, acquiring bank, business entity, or person who receives actual notice of this Order (by personal service or otherwise) that (a) holds, controls, or maintains custody of any account or asset of any Defendant, (b) holds, controls, or maintains custody of any asset associated with credit or debit card charges made on behalf of any

Defendant, including reserve funds held by payment processors, or (c) has held, controlled, or maintained custody of any such account or asset at any time since the date of entry of this Order shall:

    A.    Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishing, conversion, sale, or other disposal of any such asset except by further order of this Court or at the request of the Temporary Receiver acting pursuant to Section XIII of this Order;

    B.    Deny any person, except the Temporary Receiver, access to any safe deposit box that is:

        1.    Titled in the name of any Defendant, either individually or jointly; or

        2.    Otherwise subject to access by any Defendant;

    C.    Provide the Temporary Receiver, within fourteen (14) business days of receiving a copy of this Order (unless it has already done so), a sworn statement setting forth:

        1.    The identification number of each account or asset:

            a)    Titled in the name, individually or jointly, of any of the Defendants;

            b)    Held on behalf of, or for the benefit of, any of the Defendants; or

            c)    Associated with credit or debit card charges made on behalf of any of the Defendants;

        2.    The balance of each such account, or a description of the nature and value of each such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and

        3.    The identification of any safe deposit box that is either titled in the name, individually or jointly, of any of the Defendants, or is otherwise subject to access by any of the Defendants; and

D.     Upon the request of the FTC, promptly provide the FTC with copies of all records or other documentation pertaining to such account or asset, including originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

## VII.

### FINANCIAL STATEMENTS

IT IS FURTHER ORDERED that each Defendant, within two (2) weeks of service of a request by the Temporary Receiver, shall prepare and deliver to counsel for the FTC and to the Temporary Receiver updated financial statements using the "Financial Statement of Individual Defendant" and "Financial Statement of Corporate Defendant" forms previously provided to them by the FTC. The financial statements shall be accurate as of the date of the Temporary Receiver's request for such statements. Each Defendant shall include in the financial statements a full accounting of all funds and Assets, whether located inside or outside of the United States, that are (a) titled in the name of such Defendant, jointly, severally, or individually; (b) held by any person or entity for the benefit of such Defendant; or (c) under the direct or indirect control of such Defendant.

## VIII.

### REPATRIATION OF FOREIGN ASSETS AND DOCUMENTS

IT IS FURTHER ORDERED that within ten (10) days following the service of this Order (unless it has already done so), each Defendant shall:

A.     Provide the FTC and the Temporary Receiver with a full accounting of all funds, Documents, and Assets outside of the United States that are: (1) titled in the name, individually or jointly, of any Defendant; or (2) held by any person or entity for the benefit of any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant;

B.     Transfer to the territory of the United States and deliver to the Temporary

Receiver all funds, Documents, and Assets located in foreign countries that are: (1) titled in the name individually or jointly of any Defendant; or (2) held by any person or entity for the benefit of any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant; and

C.     Provide the FTC access to all records of accounts or Assets of any Defendant held by financial institutions located outside the territorial United States by signing the Consent to Release of Financial Records form previously provided by the FTC.

## IX.

### NONINTERFERENCE WITH REPATRIATION

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from taking any action, directly or indirectly, that may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by Section VIII of this Order, including:

A.     Sending any statement, letter, fax, e-mail or wire transmission, or telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Assets have been fully repatriated pursuant to Section VIII of this Order; or

B.     Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all Assets have been fully repatriated pursuant to Section VIII of this Order.

## X.

### CONSUMER CREDIT REPORTS

IT IS FURTHER ORDERED that the FTC may obtain credit reports concerning any Defendants pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C.

- 45 -

§ 1681b(a)(1), and that, upon written request, any consumer reporting agency from which such reports are requested shall provide them to the FTC.

## XI.

## PRESERVATION OF RECORDS

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A.  Destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, Documents that relate to the business, business practices, Assets, or business or personal finances of any Defendant; and

B.  Failing to create or maintain Documents that, in reasonable detail, accurately, fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of money.

## XII.

## PROHIBITION ON RELEASE OF CUSTOMER INFORMATION OR CUSTOMER LISTS

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are **hereby preliminarily enjoined from** selling, renting, leasing, transferring, or otherwise disclosing the name, address, telephone number, credit card number, bank account number, e-mail address, or other identifying information of any person who paid money to the Defendants for products or services, or who were contacted or are on a list to be contacted by the Defendants; provided that the Defendants may disclose such identifying information to a law enforcement agency or as required by any law, regulation, or court order.

## XIII.

## CONTINUATION OF APPOINTMENT OF TEMPORARY RECEIVER

IT IS FURTHER ORDERED that Robb Evans & Associates shall continue its appointment as temporary receiver for the Receivership Defendants. The Temporary Receiver shall be the agent of this Court, and solely the agent of this Court, in acting as Temporary Receiver under this Order. The Temporary Receiver shall be accountable directly to this Court. The Court finds that the Temporary Receiver has already given bond in the sum of $10,000 in satisfaction of 28 U.S.C. § 754.

## XIV.

### TEMPORARY RECEIVER'S DUTIES

IT IS FURTHER ORDERED that the Temporary Receiver is authorized and directed to accomplish the following:

A. Assume full control of the Receivership Defendants by removing, as the Temporary Receiver deems necessary or advisable, any director, officer, independent contractor, employee, or agent of any of the Receivership Defendants, including any Defendant, from control of, management of, or participation in, the affairs of the Receivership Defendants;

B. Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, the Receivership Defendants, wherever situated. The Temporary Receiver shall have full power to divert mail and to sue for, collect, receive, take in possession, hold, and manage all Assets and Documents of the Receivership Defendants and other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Defendants. The Temporary Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Defendants. Provided, however, that the Temporary Receiver shall not attempt to collect any amount from a consumer if the Temporary Receiver believes the consumer was a victim of the unfair or deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

C. Take all steps necessary to secure and take exclusive custody of each location

from which the Receivership Defendants operate their business. Such steps may include any of the following, as the Temporary Receiver deems necessary or advisable: (1) serving this Order; (2) completing a written inventory of all Receivership Assets; (3) obtaining pertinent information from all employees and other agents of the Receivership Defendants, including the name, home address, Social Security Number, job description, passwords or access codes, methods of compensation, and all accrued and unpaid commissions and compensation of each such employee or agent; (4) photographing and videotaping any or all portions of the location; (5) securing the location by changing the locks and disconnecting any computer modems or other means of access to the computer or other records maintained at that location; and (6) requiring any persons present on the premises at the time this Order is served to leave the premises, to provide the Temporary Receiver with proof of identification, or to demonstrate to the satisfaction of the Temporary Receiver that such persons are not removing from the premises Documents or Assets of the Receivership Defendants. Law enforcement personnel, including police or sheriffs, may assist the Temporary Receiver in implementing these provisions in order to keep the peace and maintain security. If requested by the Temporary Receiver, the United States Marshal will provide appropriate and necessary assistance to the Temporary Receiver to implement this Order and is authorized to use any necessary and reasonable force to do so;

D.      Conserve, hold, and manage all Assets of the Receivership Defendants, and perform all acts necessary or advisable to preserve the value of those Assets in order to prevent any irreparable loss, damage, or injury to consumers or creditors of the Receivership Defendants, including obtaining an accounting of the Assets and preventing the unauthorized transfer, withdrawal, or misapplication of Assets;

E.      Enter into and cancel contracts, and purchase insurance as advisable or necessary;

F.      Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of consumers and creditors who have transacted business with the Receivership Defendants;

G.      Manage and administer the business of the Receivership Defendants until further order of this Court by performing all incidental acts that the Temporary Receiver deems to be advisable or necessary, which includes retaining, hiring, or dismissing any employees, independent contractors, or agents;

H.      Prevent the destruction or erasure of any web page or website registered to and operated, in whole or in part, by Defendants;

I.      Take all steps necessary to ensure that any of Defendants' web pages or websites relating to dietary supplements, other health-related products, and Upsell products and services, which include "Free Shipping Rewards" (and similar programs that offers "free shipping" on Defendants' products and other products for a monthly fee), "Magazine Rewards Plus" (and similar programs that offers consumers subscriptions to various magazines and publications for a monthly or annual fee), "VIP Savings" (and similar programs that offers discounts and coupons for stores, restaurants and other products or services for a monthly fee), "My Fitness DVDs" and "My Exercise DVDs" (and similar programs that offer "free" exercise DVDs when a consumer enrolls and agrees to pay monthly fees for additional DVDs), and "Playboy Offer" and "DVD Entertainment" (and similar programs that offer "free" adult film DVDs when a consumer enrolls and agrees to pay monthly fees for additional DVDs), cannot be accessed by the public;

J.      Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Temporary Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

K.      Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order. The Temporary Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except payments that the Temporary Receiver deems necessary or advisable to secure Assets of the Receivership Defendants, such as rental

payments;

L.      Suspend business operations of the Receivership Defendants if in the judgment of the Temporary Receiver such operations cannot be continued legally and profitably;

M.      Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal or foreign courts or arbitration proceedings as the Temporary Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants, or that the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order, including actions challenging fraudulent or voidable transfers;

N.      Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Temporary Receiver in his role as Temporary Receiver, or against the Receivership Defendants, as the Temporary Receiver deems necessary and advisable to preserve the Assets of the Receivership Defendants, or as the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order;

O.      Issue subpoenas to obtain Documents and records pertaining to the Receivership, and conduct discovery in this action on behalf of the Receivership estate;

P.      Maintain accurate records of all receipts and expenditures incurred as Temporary Receiver; and

Q.      Cooperate with reasonable requests for information or assistance from any state or federal law enforcement agency.

## XV.

### DELIVERY OF RECEIVERSHIP PROPERTY

IT IS FURTHER ORDERED that to the extent they have not already done so, Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and any other person with possession, custody or control of property or of records relating to the Receivership Defendants shall upon notice of this Order by personal service or otherwise

immediately notify the Temporary Receiver of, and, upon receiving a request from the Temporary Receiver, immediately transfer or deliver to the Temporary Receiver possession, custody, and control of, the following:

       A.     All Assets of the Receivership Defendants;

       B.     All Documents of the Receivership Defendants, including books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

       C.     All computers and data in whatever form used to conduct the business of the Receivership Defendants;

       D.     All Assets belonging to other persons or entities whose interests are not under the direction, possession, custody, or control of, the Receivership Defendants; and

       E.     All keys, codes, and passwords necessary to gain or to secure access to any Assets or Documents of the Receivership Defendants, including access to their business premises, means of communication, accounts, computer systems, or other property.

In the event that any person or entity fails to deliver or transfer any asset or otherwise fails to comply with any provision of this Section, the Temporary Receiver may file ex parte an Affidavit of Non-Compliance regarding the failure. Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Temporary Receiver. The writs shall authorize and direct the United States Marshal or any sheriff or deputy sheriff of any county, or any other federal or state law enforcement officer, to seize the asset, document, or other item covered by this Section and to deliver it to the Temporary Receiver.

## XVI.

### PROVISION OF INFORMATION TO THE TEMPORARY RECEIVER

     IT IS FURTHER ORDERED that Defendants shall provide to the Temporary Receiver, immediately upon request, the following:

       A.     A list of all Assets and property, including accounts, of the Receivership

Defendants that are held in any name other than the name of a Receivership Defendant, or by a person or entity other than a Receivership Defendant; and

B.     A list of all agents, employees, officers, servants or those persons in active concert and participation with the Individual Defendants and Receivership Defendants, who have been associated or done business with the Receivership Defendants.

## XVII.

### COOPERATION WITH THE TEMPORARY RECEIVER

IT IS FURTHER ORDERED that Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and any other person served with a copy of this Order shall fully cooperate with and assist the Temporary Receiver in taking and maintaining possession, custody, or control of the Assets of the Receivership Defendants. This cooperation and assistance shall include: providing information to the Temporary Receiver that the Temporary Receiver deems necessary in order to exercise the authority and discharge the responsibilities of the Temporary Receiver under this Order; providing any password required to access any computer, electronic file, or telephonic data in any medium; advising all persons who owe money to the Receivership Defendants that all debts should be paid directly to the Temporary Receiver; and transferring funds at the Temporary Receiver's direction and producing records related to the Assets and sales of the Receivership Defendants.

The entities obligated to cooperate with the Temporary Receiver under this provision include banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, precious metals dealers and other financial institutions and depositories of any kind, and all common carriers, third-party billing agents, including payment processors, and other telecommunications companies, that have transacted business with the Receivership Defendants.

## XVIII.

### INTERFERENCE WITH THE TEMPORARY RECEIVER

IT IS FURTHER ORDERED that Defendants, their officers, agents, servants, employees,

attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and their corporations, subsidiaries, divisions, or affiliates, **are hereby preliminarily restrained and enjoined** from directly or indirectly:

      A.      Interfering with the Temporary Receiver managing, or taking custody, control, or possession of, the Assets or Documents subject to this Receivership;

      B.      Transacting any of the business of the Receivership Defendants;

      C.      Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Defendants, or the Temporary Receiver; and

      D.      Refusing to cooperate with the Temporary Receiver or the Temporary Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

## <u>XIX.</u>

### STAY OF ACTIONS AGAINST RECEIVERSHIP DEFENDANTS

IT IS FURTHER ORDERED that, except by leave of this Court, during the pendency of the Receivership ordered herein, Defendants, their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and their corporations, subsidiaries, divisions, or affiliates, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Defendants, including:

      A.      Filing or assisting in the filing of a petition for relief under the Bankruptcy Code, 11 U.S.C. § 101 et seq., or of any similar insolvency proceeding.

      B.      Commencing, prosecuting, or continuing a judicial, administrative, or other action or proceeding against the Receivership Defendants, including the issuance or

employment of process against the Receivership Defendants, except that such actions may be commenced if necessary to toll any applicable statute of limitations;

C.      Filing or enforcing any lien on any asset of the Receivership Defendants, taking or attempting to take possession, custody, or control of any asset of the Receivership Defendants; or attempting to foreclose, forfeit, alter, or terminate any interest in any asset of the Receivership Defendants, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise; or

D.      Initiating any other process or proceeding that would interfere with the Temporary Receiver managing or taking custody, control, or possession of, the Assets or Documents subject to this receivership.

*Provided that*, this Order does not stay: (i) the commencement or continuation of a criminal action or proceeding; (ii) the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or (iii) the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

## XX.

### COMPENSATION OF TEMPORARY RECEIVER

IT IS FURTHER ORDERED that the Temporary Receiver and all personnel hired by the Temporary Receiver are herein authorized, including counsel to the Temporary Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by, in the possession or control of, or which may be received by, the Receivership Defendants. The Temporary Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation. The Temporary Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

/ / /

/ / /

# XXI.

## ACCESS TO BUSINESS PREMISES AND RECORDS

IT IS FURTHER ORDERED that:

A.     The FTC and the Temporary Receiver, and their representatives, agents, and assistants, shall have immediate access to the business premises and storage facilities owned, controlled, or used by any Receivership Defendant, including the offices and facilities at or in the vicinity of: 16000 Ventura Boulevard, Suite 1102, Encino, California; 9601 Owensmouth Avenue, Suite 29, Chatsworth, California; 4545 Spring Mountain Road, Suite 104, Las Vegas, Nevada, and any offsite commercial mail boxes used by any Receivership Defendant. The FTC and the Temporary Receiver are authorized to employ the assistance of law enforcement as they deem necessary to effect service and to implement peacefully this Order. The FTC and the Temporary Receiver may exclude Receivership Defendants and their employees from the business premises during the immediate access. The purpose of the immediate access shall be to inspect and copy the business and financial records of the Receivership Defendants, including forensic imaging of electronically stored information. Such business records include correspondence, contracts, emails, and financial data.

B.     The FTC and the Temporary Receiver and their representatives, agents, and assistants, shall have the right to remove materials from the above-listed premises for inspection, inventorying, and copying.

C.     The FTC shall return any removed materials to the Temporary Receiver within five (5) business days, or such time as is agreed upon by the FTC and the Temporary Receiver.

D.     Receivership Defendants and all employees or agents of Receivership Defendants shall provide the FTC and the Temporary Receiver with any necessary means of access to Documents and records, including, without limitation, the locations of the Receivership Defendants' business premises, keys and combinations to locks, computer access codes, and storage area access information.

E.      If any Documents, computers, or electronic data storage devices containing information related to the business practices or finances of the Receivership Defendants are at a location other than those listed herein, including the personal residence(s) of the Defendants, then, immediately upon notice of this Order, Defendants shall produce to the Temporary Receiver all such Documents, computers, or electronic data storage devices. In order to prevent the destruction of electronic data, upon service of this Order upon Receivership Defendant(s), any computers or electronic data storage devices containing such information shall be powered down (turned off) in the normal course for the operating systems used on such devices and shall not be used until produced for copying and inspection, along with any codes needed for access.

F.      Within forty-eight (48) hours of service of this Order, the Receivership Defendants (unless they have already done so) shall produce to the Temporary Receiver a list of all agents, employees, officers, servants and those persons in active concert and participation with it, who have been associated or done business with the Receivership Defendant(s).

## XXII.

### NONINTERFERENCE WITH CONSUMER WITNESSES

IT IS FURTHER ORDERED that:

A.      Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, **are hereby preliminarily restrained and enjoined** from taking any action, directly or indirectly, that may result in the intimidation and noncooperation of consumer witnesses, including:

1.      Requiring consumers seeking a refund to sign an agreement preventing them from providing information about Corporate Defendants or sharing their experiences with Corporate Defendants;

2.      Enforcing such agreements; and

3.      Sending any statement, letter, fax, e-mail or wire transmission, or

telephoning or engaging in any other act, directly or indirectly, that results in the intimidation or noncooperation of consumers or potential witnesses;

B.      Consumers may cooperate with the FTC and the Temporary Receiver without regard to any existing agreement preventing consumers from communicating with outside parties about Corporate Defendants.

## XXIII.

### DISTRIBUTION OF ORDER BY DEFENDANTS

IT IS FURTHER ORDERED that Defendants shall immediately provide a copy of this Order to each affiliate, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, servant, attorney, spouse, subsidiary, division, and representative of any Defendant, and shall, within ten (10) days from the date of entry of this Order, provide the FTC with a sworn statement that Defendants have complied with this provision of the Order, which statement shall include the names and addresses of each such person or entity who received a copy of this Order. Furthermore, Defendants shall not take any action that would encourage officers, agents, members, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns or other persons or entities in active concert or participation with them to disregard this Order or believe that they are not bound by its provisions.

## XXIV.

### SERVICE ON FINANCIAL INSTITUTIONS, ENTITIES OR PERSONS

IT IS FURTHER ORDERED that copies of this Order may be served by any means, including facsimile transmission, e-mail, and overnight delivery service, upon any financial institution or other entity or person that may have possession, custody, or control of any Documents or Assets of any Defendant, or that may otherwise be subject to any provision of this Order. Service upon any branch or office of any financial institution shall effect service upon the entire financial institution.

///

///

## XXV.

### GENERAL SERVICE OF ORDER

IT IS FURTHER ORDERED that this Order and the initial papers filed in this matter may be served on Defendants, upon the business premises of Defendants, and upon any financial institution or other entity or person that may have possession, custody, or control of any Documents or Assets of any Defendant, or that may be subject to any provision of this Order, by employees of the FTC, by employees of any other law enforcement agency, by any agent of Plaintiff or by any agent of any process service retained by Plaintiff.

## XXVI.

### GENERAL CORRESPONDENCE

IT IS FURTHER ORDERED that, for the purpose of this Order, all correspondence and service of pleadings on Plaintiff shall be addressed to:

Shameka L. Walker
Danielle Estrada
Melissa Dickey
Federal Trade Commission
600 Pennsylvania Avenue NW, Mail drop CC-8559 Washington, DC 20580
Fax:  (202) 326-3395
Email: swalker@ftc.gov (Walker); destrada@ftc.gov (Estrada); mdickey@ftc.gov (Dickey)

## XXVII.

### DURATION OF PRELIMINARY INJUNCTION ORDER

IT IS FURTHER ORDERED that, unless otherwise ordered by this Court, this Preliminary Injunction Order shall remain in effect until the Court's entry of final judgment in this case.

### CONCLUSION

In sum, with good cause appearing, and for the foregoing reasons,

IT IS HEREBY ORDERED that a preliminary injunction is issued against the following Defendants: Health Formulas, LLC; Pure Vitamins, LLC; Longhorn Marketing, LLC; Method

Direct, LLC; Weight Loss Dojo, LLC; VIP Savings, LLC; DJD Distribution, LLC; MDCC, LLC; Jason Miller; and Danelle Miller.

IT IS FURTHER ORDERED that the asset freeze and appointment of a Temporary Receiver originally ordered on October 9, 2014 in this action (ECF No. 12) shall be MAINTAINED in accordance with the provisions set forth in this Order. Robb Evans & Associates shall continue as Temporary Receiver for the Receivership Defendants.

DATED this 6th day of May, 2015.

_____
**RICHARD F. BOULWARE, II**
**United Sates District Judge**